# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

CHARLES BROWNELL,     )
           )
  **Plaintiff,**      )   **Civil Action No.**
           )   **17-11462-FDS**
  **v.**        )
           )
NANCY A. BERRYHILL, Acting  )
Commissioner of Social Security,   )
           )
  **Defendant.**     )
_____)

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND DEFENDANT'S MOTION TO AFFIRM

**SAYLOR, J.**

  This is an appeal of a final decision of the Commissioner of the Social Security Administration ("SSA") denying the application of plaintiff Charles Brownell for Social Security Disability Income ("SSDI") benefits. Brownell appeals the denial of his application on the ground that the decision is not supported by substantial evidence as required by 42 U.S.C. § 405(g). Specifically, he contends that the administrative law judge ("ALJ") failed to properly assess his residual functional capacity ("RFC") and improperly relied on the testimony of an unreliable vocational expert. He further contends that remand is warranted in order to permit the ALJ to make a proper finding of disability.

  Brownell has moved to reverse the decision of the Commissioner, and defendant has cross-moved to affirm the decision of the Commissioner. For the reasons stated below, the decision will be affirmed.

# I. Background

## A. Factual Background

### 1. Medical Records

Charles Brownell was 50 years old on October 31, 2010, the time he contends his disability began. (A.R. 20, 425).[1] He at least began 9th grade, but did not graduate from high school. (A.R. 70, 301) He has no specialized job training, nor did he attend trade or vocational school. (A.R. 301). He served in the military from February 1980 to December 1985. (A.R. 262). He has previously worked as a day laborer, shelf stocker, roofer, framer, forklift driver, and bending machine operator. (A.R. 301, 307, 309-20, 339-46). He was last gainfully employed in October 2012, stocking dairy aisles part-time at a Shaw's supermarket; he was let go because he would miss dates on milk containers, and could not complete his tasks on time. (A.R. 369, 908, 1018). Prior to being laid off, he reported annual earnings just below $3,760. (A.R. 284). He is not currently working and not earning any income. (A.R. 290-92). He resides in Tyngsborough, Massachusetts, with his wife. He has a son, a daughter, and a granddaughter. (A.R. 331-32).

Brownell reported a knee impairment in October 2007, when he went to the emergency room reporting knee pain that had started after running and had kept him awake at night for two weeks. (A.R. 564-65, 573). An x-ray revealed small degenerative spurs, compatible with minimal osteoarthritis. (A.R. 24, 580). He was diagnosed with tendinitis and a sprain. (A.R. 563). He was prescribed Percocet and limited activity for seven days. (A.R. 563).

---

[1] Brownell originally alleged that the onset of his disability was February 1, 2004, but his counsel subsequently amended the date to October 31, 2010. (A.R. 20, 47, 112). The last date that he was insured was December 31, 2010. (A.R. 23; *see* A.R. 68). To be eligible for SSDI benefits, a claimant must be "insured for disability" at the time he became disabled. A claimant is insured for disability in any quarter in which he was fully insured and had "at least 20 [quarters of coverage] in the 40-quarter period . . . ending with that quarter." 20 C.F.R. § 404.130(b). Brownell meets the SSDI insured status requirement through December 31, 2010. (A.R. 23).

From April to July 2008, Brownell visited his primary care provider, Dr. Nasim Ghaffar, complaining of tingling and numbness in both hands, possibly related to carpal tunnel syndrome. Dr. Ghaffar noted his history of chronic obstructive pulmonary disease ("COPD") and asthma. (A.R. 710-14). Dr. Ghaffar referred him for an electromyography ("EMG"), which reported positive for left cubital tunnel syndrome, although on examination he had normal sensation, normal grip, and normal range of motion. (A.R. 711). She prescribed ibuprofen, advised him to use splints, and noted that corticosteroid injections should be considered if the symptoms did not improve. (A.R. 714).

In August 2008, Brownell had a motorcycle accident resulting in rib fractures for which he was treated. (A.R. 708). None of the relevant records mention any reported knee symptoms.

In October 2008, Brownell applied for Emergency Aid to the Elderly, Disabled and Children ("EAEDC") benefits, alleging COPD and shortness of breath. (A.R. 999). He indicated that his breathing issues affected his job because he could not keep up with the pace of work. (A.R. 1000).

On December 13, 2008, Brownell was referred to Dr. Le M. Doan by the UMass Disability Evaluation Services for a psychodiagnostic interview after reporting anxiety attacks. (A.R. 1015). Dr. Doan noted that Brownell arrived well-groomed, but with a strong odor of alcohol. (A.R. 1017). She also noted that Brownell minimized his alcohol use, but that he had a past DUI. (A.R. 1016-17). Her "diagnostic impressions" included alcohol abuse, anxiety, and emphysema, with a global assessment of functioning ("GAF") score of 68, in the mild range. (A.R. 1017). Brownell stated during his interview that the interference with his work was caused by his physical rather than psychiatric problems. (*Id.*).

A January 2009 disability report from the UMass Medical School Center for Health Care

Financing Disability Evaluation Services stated that Brownell was not then performing substantial gainful activity, and that his past work exceeded his current abilities. (A.R. 987, 993). The report addressed various issues affecting Brownell, including COPD, emphysema and asthma, gastroesophageal reflux disease ("GERD"), alcohol abuse, carpal tunnel syndrome, and anxiety attacks, but did not mention any knee impairment. (A.R. 988, 994). An RFC physical examination performed by Dr. Nathaniel Manning indicated that he was capable of light work with limitations for fumes, dust, odors, hazard, extreme hot or cold, and humidity, with environmental limitations not exceeding the full range of light work. (A.R. 992, 995-96). An RFC mental examination performed by Dr. Paul Kaufman indicated that he had no mental limitation that interfered with his ability to perform basic work in a competitive labor market. (A.R. 988, 991, 998).

On August 24, 2010, Brownell completed a Masshealth Adult Disability Supplement form, which requested that he "[l]ist and describe all your medical and mental health problems." (A.R. 972, 981). He responded "emphysema." (A.R. 972). Brownell reiterated that he had trouble breathing and carrying weight. (A.R. 972). He stated that it was difficult for him to find work where he lived that was not roofing or building, and that he could no longer keep up with the type of activity these jobs required. (A.R. 972-73). He reported that he could "sit" and "stand" "all the time," but could "walk," "bend," "lift," or "reach" "not very often." (A.R. 976). He was able to shop for food, plan meals, cook, wash dishes, do laundry, dust, make beds, empty the trash, and vacuum. (*Id.*). Consistent with that application, the agency's Massachusetts Continuing Disability Determination Review form, which is dated October 6, 2010, reported no improvement of his condition regarding his emphysema, COPD, asthma, GERD, carpal tunnel syndrome, rib fractures, forearm lacerations, and anxiety. (A.R. 962). No additional conditions

were listed.  (A.R. 964).  At the time, Brownell was not performing substantial gainful activity. (*Id.*).

Brownell's medical records from the beginning of 2011 make no mention of knee problems.  He saw Dr. Ghaffar for a medical assessment on June 30, 2011.  (A.R. 700).  He reported issues with hearing in both ears and memory loss.  (A.R. 700-01).  Dr. Ghaffar recommended an otolaryngologist ("ENT") consultation for Brownell's hearing, and a neurology consultation for his memory loss.  (*Id.*).

In August 2011, Brownell saw Dr. Ghaffar again.  (A.R. 690).  Her notes indicate he was "[n]egative for joint stiffness, joint pain, joint swelling."  (*Id.*).  She administered an abdominal ultrasound, which revealed a fatty infiltration of the liver with presumed area of sparing near the gallbladder fossa.  (A.R. 450, 691).  Dr. Ghaffar encouraged him to abstain from alcohol.  (A.R. 691).

In September 2011, Brownell saw Dr. Jason Viereck for a neurology consultation because of claimed memory loss.  (A.R. 796-99).  Dr. Viereck's notes briefly mention that Brownell reported "[p]ains in elbows, knees," but his physical examination at that time revealed normal tone, strength, sensation, and reflexes.  (A.R. 796).  An MRI of his brain was scheduled. (A.R. 796-97).  The follow-up consultation in October 2011 revealed that the MRI results were normal.  In speaking to Brownell, Dr. Viereck noticed that he exhibited symptoms consistent with ADD, and gave Brownell a prescription for Adderall.  (A.R. 800).  That same month, Brownell had an ENT consultation and was prescribed hearing aids.  (A.R. 388-90).

In January 2012, Brownell added knee pain, in addition to back pain and memory loss, to his Massachusetts disability claim.  (A.R. 943-46, 954-55).  He reported that his knee pain started in the 1990s.  (A.R. 954).  He reported that he could no longer go on long walks or play

sports because he would "get out [of] breath," and could no longer bend or lift because it hurt his knees and back. (A.R. 955). He also complained of short-term memory loss and difficulties concentrating. (*Id.*). He stated that he could not work because he would get "winded" easy, but could do some "limited light stuff." (A.R. 959). He also mentioned that he suffered from confusion and memory loss, and had recently started treatment for it. (*Id.*).

In June 2012, Brownell saw Dr. Benjamin Henkle, complaining of longstanding stiffness in his middle finger. (A.R 665). Brownell reported that his finger would stick when he opened it, but no more than once or twice a year, and that he wore a wrist support during work.[2] He reported that the pain had worsened recently and he had trouble closing his finger. (*Id.*). Dr. Henkle diagnosed trigger finger and referred him to Dr. Kevin Tomany, an orthopedic surgeon. (*Id.*).

In July 2012, Brownell saw Dr. Joel Epstein, a consultative physician for the Massachusetts Rehabilitation Commission Disability Determination Services. The examination revealed no changes in his condition, as well as normal strength in upper and lower extremities, with a normal gait. (A.R. 650). Dr. Epstein noted that Brownell had tender knees and mild pain with no effusions and a full range of motion that could be consistent with early osteoarthritis. (*Id.*).

Also in July 2012, Dr. Ghaffar referred Brownell to Dr. Sweta A. Desai, a lung specialist, because of his complaints of worsening shortness of breath and COPD. (A.R. 787-89). Dr. Desai diagnosed dyspnea. (A.R. 788). Brownell received chest x-rays and was scheduled for a follow-up appointment in August 2012, during which Dr. Desai assessed Brownell's asthma. (A.R. 790-92).

---

[2] Brownell reported that he was employed as a framer at the time. (A.R. 665).

In September 2012, Brownell saw Dr. William Krueger from the Massachusetts Rehabilitation Commission Disability Determination Services, who performed a disability determination examination. (A.R. 652-55). Brownell reported that the Adderall had helped his condition. (AR. 652). He stated that he could no longer work, and that this caused him stress because of his financial situation. (A.R. 653). During the examination, Dr. Krueger noted that he was oriented to person, place and time, except that he had the date off by several days. (*Id.*). He correctly identified the current president but not the former. (*Id.*). He remembered only one out of three items after ten minutes, and scored a 25 out of 30 on the mini-mental state examination ("MMSE"). (A.R. 653-54). Dr. Krueger diagnosed anxiety symptoms secondary to a medical condition and COPD, and assessed his GAF at 54. (A.R. 655).

In December 2012, Brownell saw Dr. Desai again. (A.R. 793-95). Dr. Desai increased Brownell's asthma medication and recommended that he quit smoking. (*Id.*).

In January 2013, Brownell was referred by Dr. Ghaffar to Dr. Samuel D. Gerber, an orthopedic surgeon, because of his complaints of ongoing pain in his knees. (A.R. 725). MRIs of both of Brownell's knees revealed moderate to severe patellofemoral arthritis and degenerative signal of the medial meniscus. (A.R. 719, 723, 882). He was prescribed physical therapy, which apparently was ineffective. (A.R. 724, 726).

On February 6, 2013, Dr. Gerber performed arthroscopic surgery on Brownell's left knee at Lowell General Hospital. (A.R. 739). The operative report confirmed stage four patellofemoral arthritis and grade two cartilage changes. (A.R. 754). Dr. Gerber continued treating Brownell after the surgery, and administered methylprednisolone shots in both knees. (A.R. 303, 717-19).

In May 2013, in connection with Brownell's continuing Massachusetts EAEDC benefits

review, Dr. Manning determined that he was capable of performing a range of sedentary work activities, but given his age, education, and skills, he was considered disabled by the state. (A.R. 912, 914-15).

Brownell first applied for SSI in January 2013 and SSDI in February 2013, citing emphysema, COPD, memory loss, and arthritis in both knees. (A.R. 20, 111, 125).

In August 2013, Brownell saw Dr. Robert Sampson for a mental-health examination related to his Social Security application. (A.R. 734-37). He reported that Adderall had helped his short-term memory initially but was no longer working. (A.R. 737). He had the date wrong by five days. (A.R. 736). He remembered three out of three items after five minutes, and scored a 29 out of 30 on the MMSE. (*Id.*). He reported feeling depressed because of his financial issues. (A.R. 737). Dr. Sampson assessed that Brownell was able to understand, follow, and remember simple instructions, with minimal impairment in responding to routine work pressures in a competitive work environment. (*Id.*). His GAF was assessed at 60. (*Id.*).

The initial disability-determination explanations show physical and mental impairments as of January 7, 2013. (A.R. 111-23 (SSDI); A.R. 125-38 (SSI)). Dr. John Manuelian assessed Brownell's RFC as being able to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk with normal breaks for a total of four hours, and sit for six hours out of an eight-hour work day. (A.R. 120-22, 135-36). He also found that Brownell could occasionally climb stairs or ladders, balance, stoop, kneel, and crouch. (*Id.*). Those findings are consistent with the RFC maximum sustained work capability of sedentary. (A.R. 138). Dr. Robert Lasky, a state agency psychological consultant, found that his mental impairments, including organic mental disorders and affective disorders, were mild. (A.R. 119, 133).

The SSA concluded that there was insufficient evidence of disability as of December 31,

2010, the date he was last insured. (A.R. 122, 136). However, because of his age, he was found disabled as of January 2013, with no expectation of medical improvement. (A.R. 138-39).

Brownell requested reconsideration of the denial of his SSDI benefits, but did not allege any changes in his condition. (A.R. 142, 146). In January 2014, Dr. Judith Clementson, a state agency psychological consultant, assessed Brownell's file. (A.R. 147-49). She took into account the prior assessments by Dr. Sampson in August 2013, by Dr. Krueger in September 2012, and Dr. Ghaffar in 2011. (A.R. 143-45). She rated Brownell's affective disorders and ADD as non-severe. (A.R. 147). She indicated that there was not enough evidence to determine whether he was disabled as of the date he was last insured, December 31, 2010, and affirmed the initial determination. (A.R. 147, 149).

In June 2014, Brownell saw Dr. Ghaffar again, reporting depression and anxiety. (A.R. 826). He was prescribed Zoloft and Xanax, and was referred to a psychiatry consultation for depression. (A.R. 827). Brownell reported feeling well and without complaints on medication at his follow-up appointment with Dr. Ghaffar in September 2014, and asked to discontinue Zoloft. (A.R. 819). In November 2014, Brownell also reported to Dr. Ghaffar that his anxiety was under control. (A.R. 816).

In August 2015, Dr. Frank A. Graf, an orthopedic surgeon, reviewed Brownell's complete medical history and assessed his condition. (A.R. 1018-23). He examined his knees and diagnosed "[b]ilateral genu vara with patella femoral and medial compartment degenerative osteoarthritis left knee" and "[p]atella femoral osteoarthritis right knee." (A.R. 1022). Dr. Graf's assessment of Brownell's condition, as far as his physical RFC was concerned, was generally consistent with that of Dr. Manning and Dr. Manuelian—that he could frequently lift 20 pounds; occasionally lift 25 pounds; stand or walk for only 2 hours of an 8-hour work day;

and only occasionally climb ramps or stairs.  (A.R. 1024-25).  However, Dr. Graf opined that the physical limitations began on October 31, 2010.  (A.R. 1027).

Brownell saw Dr. Erin Durocher in the fall of 2015 for a mental-health assessment.  (A.R. 1028-39).  Dr. Durocher evaluated Brownell's mental RFC as impaired because of his anxiety, finding that he struggled to make decisions, and that worrying inhibited his concentration and appropriate interactions at work, and prevented him from retaining and executing instructions.  (A.R. 1036-38).  She also noted that his memory was severely compromised, and that he would have difficulties going to work.  (A.R. 1038).  She also diagnosed social phobia.  (*Id.*).  Due to those impairments, she concluded that he would likely need to miss work more than four days per month.  (A.R. 1039).  Dr. Durocher assessed Brownell's GAF at 50.  (A.R. 1035).

## 2.   **Hearing Testimony**

The SSA conducted a hearing concerning Brownell's application for disability benefits on April 23, 2015.  (A.R. 65).  At the hearing, he appeared and testified before the ALJ.  (*Id.*).  He was represented by counsel at the hearing.  (*Id.*).

During the hearing, Brownell testified that he does not work and receives governmental assistance in the form of food stamps and SSI.  (A.R. 70).  He testified that he last worked in 2012 at a Shaw's supermarket, but was let go after a month because he could not timely process 300 gallons of milk each night, and kept forgetting the dates on the milk bottles.  (A.R. 70-71).

He testified that he suffers from knee problems that got progressively worse through the years, and that he was diagnosed with arthritis "a couple years ago" when he had surgery on his left knee. (A.R. 76-77).  He testified that he has had trouble with his left knee "[e]very single day" since at least 2010.  (A.R. 79).  He testified that he was diagnosed with carpal tunnel syndrome in 2008, after years of pain in his left arm, elbow, and hand.  (A.R. 78).  He testified

that he has had trouble breathing since 2010, and was diagnosed with COPD.   (A.R. 79, 82).   He

has had asthma since childhood, but still has not completely stopped smoking.  (A.R. 80-82).  He

testified that he suffers from memory loss and hearing loss and wears hearing aids. (A.R. 81, 83-

85).

During the hearing, Brownell's wife, Tecia Brownell, also testified.  (A.R. 87-90).  She

testified that her husband has had issues with his knees, preventing him from standing, but did

not recall when the issues started; that her husband has had issues with his left hand and his

breathing since before December 2010; that he suffered from memory loss, to the point where

she had to forbid him from using the stove to cook because he kept forgetting and burning

things; and that she did not believe he would have been able to work a job requiring him to stand

very long, lift much weight, or remember instructions since December 2010.  (A.R. 87-89).

During the hearing, vocational expert Ruth Baruch testified as to Brownell's capacity for

work in 2010, under various scenarios.  (A.R. 94-105).  The ALJ asked Baruch to assume a

person of Brownell's age, education, and work experience, with the following restrictions:

limitation to light exertional work; need to avoid concentrated exposure to extreme hot and cold

temperatures, humidity, and pulmonary irritants, such as dust, fumes, gases; and limitation to

simple, routine tasks.  (A.R. 94).  Baruch testified that such a person could not work any past job

that Brownell had previously worked.  (*Id.*).  She testified that there were other jobs in the

national economy that such a person could perform, for example, hand packager/inspector

(130,000 jobs in the national economy), bench assembler (225,600 jobs), and electrical

assembler (38,990 jobs).  (A.R. 94).  The ALJ asked Baruch if additional restrictions, such as

restrictions on climbing ramps, steps and ladders; crawling, kneeling and crouching limited to no

more than occasional basis; and reaching and handling limited to no more than frequent

bilaterally, would affect the jobs she had identified. (A.R. 95). Baruch testified that it would

not, but that only absences 10% more than the normal break period would be tolerated, as well as

absences of one day a month. (*Id.*).

Brownell's attorney asked Baruch to assume a person of Brownell's age, education, and

work experience, with the additional restrictions of standing only two hours a day, and only

occasional reaching and handling with the dominant left hand. (A.R. 95-96). Baruch testified

that the restriction of standing only two hours a day would further reduce the jobs available by

25 to 30%, and the restriction of only occasional reaching would eliminate such jobs completely.

(A.R. 96). He then asked Baruch to assume a person of Brownell's age, education, and work

experience with memory such that they would fail to remember the sequence of steps they were

supposed to perform in the job up to 15 to 20% of the time, and so would require more than

normal supervision. (A.R. 96-97). Baruch testified that in such unskilled work, it is typically

expected that the person would be supervised when learning the job, but that past the training

period, if the person makes a daily mistake, they are going to get three warnings and then lose

their job. (A.R. 97-100). Baruch further testified that if those types of mistakes happened once a

week, such a person would typically not last more than one to three months on the job. (A.R.

101).

Baruch further testified that in order to determine the number of jobs available, she

begins with the number of jobs in a census grouping of multiple job titles, which are broken

down by skill level, and further into sedentary, light, medium, heavy and very heavy work by the

Occupational Employment Quarterly, which then estimates the number of jobs in each category.

(A.R. 102-03). She testified that the actual number of people practicing such jobs could differ.

(A.R. 104). Baruch testified that she compared that method with a second method using

algorithms to determine the number of jobs available, and has found the results to be fairly close. (A.R. 104-05).

Following the hearing, Brownell submitted an affidavit by vocational expert David W. Meuse disputing Baruch's findings. (A.R. 397-99). Specifically, Meuse challenged the numbers of jobs in the national economy that Baruch had found, stating that the methodology used to make those findings was deeply flawed and that some of the jobs included in the 1979 DOT have been outsourced or automated to the point where they no longer exist in the United States. (A.R. 398-99). The ALJ presented Baruch with interrogatories to allow her to respond to the Meuse affidavit. Baruch answered in writing, providing new numbers for the jobs mentioned—706 bench assemblers, 5877 hand packagers, and 5216 electrical assemblers—but contended that those jobs still existed in significant numbers, and that Brownell would have been able to perform them. (A.R. 419-22).[3] She also provided evidence that those jobs still exist and are advertised in the national economy. (*Id.*). Brownell requested a supplemental hearing to explore these issues further. (A.R. 49, 412).

The SSA conducted a supplemental hearing concerning Brownell's application for disability benefits on February 9, 2016. (A.R. 45). At the hearing, he and Baruch appeared and testified before the ALJ. (*Id.*). During the hearing, Brownell's attorney amended the alleged onset date to October 31, 2010. (A.R. 47).

---

[3] The interrogatory answers are handwritten, and the number of bench assembler jobs is not entirely clear from the evidence. That bullet point reads: "Bench assembler 706.684.022 (51-9199) OES group production workers 1526 jobs in this group. (specific DOT codes to this census group) 706 Bench assemblers in USA based on job browser which breaks down to DOT code." (A.R. 420). At the supplemental hearing, plaintiff's lawyer clearly read the number of jobs to be 706, asking her at one point whether she had adjusted the number to "a little under 1,000" and at another point whether she had adjusted it to "706 bench assemblers," to which she answered in the affirmative. (A.R. 51, 55). The ALJ, however, in his decision, clearly read her answer to mean that there were 1526 jobs in that category, citing the 1526 figure in the text and relying on the fact that numbers of jobs exceeded "12,000 combined." (A.R. 36-37). It is likely that 706 is the correct figure—in testifying about the other two job categories, Baruch identified the number of DOT codes within the OES group before giving the total number of jobs. (*See* A.R. 420). However, this discrepancy does not change the outcome.

Brownell's attorney questioned Baruch about the different numbers she gave between her initial testimony and her written answer to the vocational expert's affidavit, and about the overall job-assessment methodology. (A.R. 50-61). Baruch testified that she changed the numbers of hand-packager jobs from 130,000 to a little under 6,000, the numbers of bench-assembler jobs from 225,600 to a little under 1,000, and the numbers of electrical-assembler jobs from 39,000 to a little under 6,000 after consulting the JobBrowser Pro software, which she said is routinely used by vocational experts. (A.R. 50-51, 55, 424). She testified that she would never place a client in a job further than fifty to seventy miles from his home. (A.R. 53). She further testified that the numbers she gave were the national total, not the number of jobs either in the region where the claimant lived or in several other regions of the country, which would have been lower. (A.R. 57). She testified that considering the job market for 2010 further complicated the assessment, because there could have been a national unemployment rate of 8%, which could mean 30% fewer jobs available than the current numbers, but that her across-the-board estimate was not industry-specific. (A.R. 58). And she testified that there was no way for a vocational expert in her position to produce a number accurate down to a single job, and that she doesn't know of any other available methodology to estimate jobs. (A.R. 59-60).

**B.     Procedural Background**

On February 14, 2013, Brownell filed an initial claim for disability benefits alleging the following conditions: emphysema, COPD, memory loss, and arthritis in both knees. (A.R. 20, 141, 150, 262, 300). The application alleged an onset date of February 1, 2004. (A.R. 141, 293). He stated that he had filed for supplemental security income, but did not file nor intend to file for any worker's compensation, public disability, or black-lung benefits. (A.R. 262).

The SSA notified Brownell on September 4, 2013, that his claim for disability benefits had been denied. (A.R. 151-53). Based on his medical reports, reports of state agency doctors

and claimant-supplied records, the SSA determined that Brownell suffered from emphysema, COPD, memory loss, and arthritis in both knees, but that his eligibility for disability benefits had passed. (A.R. 151). The SSA determined that his condition was not severe enough to be considered disabling on any date through December 31, 2010. (*Id.*).

The SSA notified Brownell on October 16, 2013, that his supplemental security income claim had been approved, and that he had been found disabled for SSI purposes as of January 7, 2013. (A.R. 20, 163). That finding and the disability beginning on January 7, 2013, are not at issue. (A.R. 20).

On October 29, 2013, Brownell filed for reconsideration. (A.R. 181, 358-62). After reconsideration, on January 17, 2014, the SSA determined that Brownell's condition was not disabling on any date through December 31, 2010, the last day that insured status for disability was met. (A.R. 182). Brownell did not request a hearing before an ALJ concerning his disability claim until June 16, 2014. (A.R. 185, 187, 189). The late filing was due to his attorney's office not having received a copy of the January 17, 2014 denial. (*Id.*). The hearing was held before the ALJ on April 23, 2015. (A.R. 201, 207). A supplemental hearing was held before the ALJ on Tuesday, February 9, 2016. (A.R. 236).

On May 13, 2016, the ALJ issued an opinion finding that Brownell was not disabled under §§ 216(i) and 223(d) of the Social Security Act through December 31, 2010, the last date insured. (A.R. 17-38). He requested review of the decision with the Appeals Council on July 12, 2016. (A.R. 261). On June 15, 2017, the Appeals Council denied his request for review. (A.R. 1).

On August 8, 2017, Brownell filed this action to review the SSA Commissioner's decision. He has moved to reverse the Commissioner's decision, and the SSA has cross-moved

to affirm it.

## II.    <u>Legal Standards</u>

### A.    <u>Standard of Review</u>

This Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  The ALJ's findings of fact are not conclusive when derived by ignoring evidence, misapplying the law, or making expert findings of fact.  *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (citing *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986)).

In applying the "substantial evidence" standard, the reviewing court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Reversal is warranted only if the ALJ committed a legal or factual error in evaluating the claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ.  *Roman-Roman v. Comm'r of Soc. Sec.*, 114 F. App'x 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue, are reviewed *de novo*.  *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

**B.      Standard for Entitlement to Disability Benefits**

In order to qualify for SSI benefits, the claimant must demonstrate that he is "disabled" within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe enough to prevent the claimant from performing not only his or her past work, but also any substantial gainful work existing in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed?  If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]'  If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations]?  If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . .  If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past?  If not, he is not disabled.  If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy?  If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

17

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in that national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's RFC in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

## III.    Analysis

### A.    The ALJ's Findings

In evaluating the evidence, the ALJ conducted the five-part analysis called for by Social Security Act regulations.

At step one, the ALJ found that Brownell did not engage in substantial gainful activity during the period from his alleged onset date of October 31, 2010, through his date last insured of December 31, 2010. (A.R. 23).

At step two, the ALJ found that through the date last insured, Brownell's COPD and asthma were severe impairments under 20 C.F.R. § 404.1520(c). (*Id.*). He found that the record showed upper-extremity impairments related to his carpal and cubital tunnel syndrome, as well as lacerations, continuous elbow pain, and trigger finger syndrome, but those impairments did not impose more than minimal functional limitations prior to the date last insured and were non-severe. (A.R. 23-24). He found that the record showed bilateral knee impairment, but that the totality of the evidence did not support a conclusion that the knee impairment was severe prior to the date last insured. (A.R. 24-25). He found that Brownell's hearing loss, to the extent it was

18

medically determinable prior to the date last insured, was non-severe.  (A.R. 25).  He further found that the record of his history of GERD showed no evidence that it imposed more than a minimal limitation in basic work functioning.  (*Id.*).  He further found that the record showed evidence of his history of anxiety and alcohol abuse prior to the date last insured, but that his mental functioning was only slightly limited.  (A.R. 26).  He further found that Brownell was not under any active treatment for mental-health symptoms through the date last insured, and overall the medical records did not support more than minimal functional deficits prior to the date last insured, although his memory loss later worsened.  (A.R. 26-27).

At step three, the ALJ found that Brownell did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (A.R. 28-29).  The only severe impairments prior to the date last insured were asthma and COPD, and the evidence did not support a finding that his respiratory impairments met listing 3.02, dealing with chronic pulmonary insufficiency, or 3.03, dealing with asthma, because the tests did not reflect listing level impairment, nor did the evidence support asthma attacks requiring emergency room visits or hospitalization.  (A.R. 29).

At step four, the ALJ determined that through his date last insured, Brownell had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), limiting him to simple, routine tasks and avoiding concentrated exposure to extreme temperatures and pulmonary irritants.  (*Id.*).  His past experience as a bending machine operator involved medium but very heavy work as performed; his past position as a store laborer involved medium unskilled work; and his past position as an overnight stocker involved heavy, semiskilled or unskilled work, according to the vocational expert.  (A.R. 34-35).  Accordingly, the exertional demands of Brownell's past work exceeded his residual functional capacity, and

he was unable to perform past relevant work.  (A.R. 33-34).

At step five, the ALJ concluded that through the date last insured, given Brownell's age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that he could have performed, even after the vocational expert revised the job numbers.  (A.R. 35).  The ALJ relied on the vocational expert's testimony that someone with his same characteristics could have worked in representative occupations such as a hand packager/inspector, a bench assembler, or an electrical assembler through the date last insured.  (A.R. 35-36).  The ALJ considered the fact that Brownell had challenged that testimony on the ground that it should take into account regional variances, the recession in 2010, and the fact that some jobs are no longer unskilled.  (A.R. 36).  Nevertheless, he credited Baruch's testimony because (1) she had 20 years' experience in vocational services; (2) she adjusted her figures in response to the criticisms and provided a rationale for her methodology; (3) she provided proof that the jobs she cited continue to exist in the national economy; and (4) she explained that the data available is not perfect, and that all methods result in estimates.  (*Id.*).  He found that there were significant numbers of jobs because "three representative jobs were identified, with numbers exceeding 12,000 combined, and two jobs had over 5,000 each available," and "Ms. Baruch provided support that these jobs are actually advertised and available, and meet the physical and mental demands of the residual functional capacity and vocational background of the claimant."  (A.R. 37).

The ALJ accordingly found that Brownell did not suffer from a disability as of December 31, 2010, the date he was last insured, under 42 U.S.C. § 423(d) and 42 U.S.C. § 1382c(a)(3)(A). (A.R. 37-38).

**B.**     **Plaintiff's Objections**

Brownell raises two objections to the ALJ's decision.  He contends that (1) the ALJ's

RFC finding was erroneous, and (2) that the vocational testimony at step five was unreliable.

### 1. The ALJ's RFC Finding

Brownell first contends that the ALJ's RFC finding as of December 31, 2010, that he could perform work at the light exertional level, was not supported by the evidence because his knee impairment was severe as of that date and should have been included. He argues that he was suffering from a degenerative impairment, therefore the date of onset should have been inferred pursuant to Social Security Ruling 83-20. He further contends that the ALJ failed to give appropriate weight to Dr. Graf's testimony, and instead substituted his lay interpretation of the medical evidence and the opinions of the state agency non-examining physicians, who had insufficient evidence to evaluate the severity of his knee impairments through the date last insured.

The claimant has the burden of providing evidence to establish how his impairments limit his RFC. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."); *Pereira v. Berryhill*, 2017 WL 3567515, at *7 (D. Mass. Aug. 17, 2017) (citing *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001); *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 328-29 (1st Cir. 1990)).

Although Brownell complained of severe knee pain that lasted two weeks in 2007, x-rays only revealed small degenerative spurs consistent with minimal osteoarthritis. (A.R. 564-65, 573, 580). Furthermore, he did not complain of a severe knee ailment between 2007 and 2011, even though he had been continuously receiving care for other impairments during that period. In 2009, Dr. Manning, his examining physician, assessed his RFC as capable of performing the full range of light work. In August 2010, Brownell did not mention a knee impairment on his Massachusetts disability supplement form. (A.R. 972, 981). In September 2011, nine months

after his date last insured, he complained of knee pain to Dr. Viereck, but a physical examination at that time revealed normal tone, strength, sensation, and reflexes. (A.R. 674). In July 2012, Dr. Epstein noted in a consultative examination that he had mildly tender knees and mild pain with full range of motion, normal strength in his extremities, and a normal gait, consistent with "early osteoarthritis." (A.R. 650). The first indication of a severe impairment came two years after his date last insured, in January 2013, when he was referred to an orthopedic surgeon. (A.R. 725). In February 2013, he underwent arthroscopic surgery and was diagnosed with stage four patellofemoral arthritis, and grade two cartilage changes, and his RFC was subsequently assessed as sedentary. (A.R. 739, 754, 912, 914).

The ALJ correctly concluded that under the circumstances, Social Security Ruling 83-20 did not require him to consult a medical advisor. (A.R. 33-34).[4] Nor was there an insufficient quantum of evidence to support an RFC determination simply because there was no physician testimony as to Brownell's RFC at the time he was last insured. The RFC is not a medical assessment, but instead is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(d); *Ramos v. Barnhart*, 119 F. App'x 295, 296 (1st Cir. 2005); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996); *Gordils*, 921 F.2d at 329 (holding that the ALJ is not precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as he does not overstep the bounds of a lay person's competence and render a medical judgment). The medical records for the period in which onset

---

[4] The relevant paragraph is the following: "In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made." Soc. Sec. Ruling 83-20, 1983 WL 31249, at *3 (Jan. 1, 1983).

is alleged are reasonably complete. They indicate that Brownell's knee pain was not disabling at least in 2009 and likely as late as September 2011, and show that it did not become severe until late 2012 or early 2013. *See Fischer v. Colvin*, 831 F.3d 31, 36 (1st Cir. 2016) (explaining that "[t]he ALJ did not rely upon the absence of medical evidence but rather the existence of 'precise' medical evidence—the normal results of the diagnostic imaging—when concluding that Fischer's impairments had not reached disabling severity prior to her DLI" and the "precise medical evidence eliminated the need for the ALJ to infer that Fischer's onset date preceded her DLI"); *Rascoe v. Comm'r of Soc. Sec.*, 103 F. Supp. 3d 169, 180-81 (D. Mass. 2015) (holding that onset date of severe depression was ambiguous and required medical advisor where records of treatment through date last insured were "sparse" and where claimant had been diagnosed with major depressive disorder prior to the dated last insured). If Brownell's date last insured were sometime in 2011 or 2012, the question might be much closer. But under the circumstances, the ALJ was permitted to infer from the silence in the relevant medical records— which include contemporaneous records seeking disability assistance from the state—to conclude that Brownell's knee condition was not severe at the relevant time.

Moreover, Brownell held several jobs between 2010 and 2012 as a retail shelf stocker, and therefore was performing work above the sedentary level through his date last insured. (A.R. 307, 908, 958). Although he did not keep those jobs, the reasons he gave for leaving were (1) as to a job in 2010, that it was seasonal work, and (2) as to his last job in 2012, that he could not keep up due to his COPD or keep track of milk dates due to his memory loss. (A.R. 908; *see* A.R. 972-73). (*But see* A.R. 1018 (Dr. Graf additionally reporting knee reasons)). Furthermore, he was still performing substantial housework in August 2010, such as shopping for food, planning meals, cooking, washing dishes, laundry, dusting, making beds, emptying the trash, and

vacuuming.  (A.R. 976).  The ALJ properly relied on Brownell's lack of reported symptoms and other activities on and around his date last insured, as there was no evidence that he had any exertional limitations for the performance of work activities that treatment records did not reveal. *See Pereira*, 2017 WL 3567515, at *7 (citing *Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446-47 (1st Cir. 1991)).

Finally, the ALJ properly accorded little weight to Dr. Graf's 2015 evaluation, and instead relied on non-examining physicians.  *See* 20 C.F.R. § 404.1527(c).  Dr. Graf was not a treating physician, but was consulted for the purposes of Brownell's disability application; therefore the ALJ was under no obligation to give his opinion controlling weight.  *Id.* § 404.1527(c)(2).  Dr. Graf's examination occurred in August 2015, years after Brownell's date last insured; that examination therefore could not provide direct evidence of his condition five years earlier, and instead interpreted the records of other physicians.  *See Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 140 (1st Cir. 1987).  The ALJ noted that the date of onset appeared only as part of a general conclusion at the end of the report, was not supported by specific findings as to why that date was chosen, and appeared to have been typed in by Brownell's attorney as opposed to being arrived at by Dr. Graf, who had handwritten his answers on the questionnaire.  (A.R. 32, 1027).  And Dr. Graf's opinion that the condition was severe at that time contradicted contemporary evidence that Brownell was not even complaining of knee pain to his treating doctors.  Taken together, that is substantial evidence supporting the ALJ's decision to afford that opinion little weight.

Because as substantial evidence supports the ALJ's assessment that plaintiff's RFC at his date last insured was to perform work at the light exertional level, the ALJ properly refused to apply Grid Rule 201.14 in Brownell's favor.  (A.R. 35); *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

## 2.   **Vocational Testimony**

Brownell further contends that the vocational expert testimony was unreliable because (1) the expert relied on the ALJ's erroneous RFC assessment; (2) she changed her testimony; (3) she provided national numbers instead of the numbers "in the region where the claimant lives or in several other regions of the country"; (4) the number of jobs available at Brownell's date last insured were 30% below the figure she relied upon due to the recession; (5) the ALJ improperly aggregated the figures to arrive at a significant number of jobs in the national economy; and (6) even relying on the figures provided by the vocational expert, they were too low to be "significant."[5]

The ALJ has the burden at step five to show that work that the claimant could perform "exists in significant numbers either in the region where [the claimant] lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

First, and as set forth above, the ALJ's RFC finding was correctly assessed, therefore the vocational expert's testimony properly relied on that assessment.

Second, the mere fact that Baruch adjusted her testimony does not show that the testimony was unreliable.  She provided answers to the ALJ's interrogatories following the introduction of an affidavit from Brownell's vocational expert; in that affidavit, she lowered her estimations of the numbers for each job that Brownell could perform in response to criticism of her earlier methodology, and explained her reasoning and the methods available to estimate the numbers of jobs in the national economy.  (A.R. 419-22).  Correcting and clarifying the record, in response to criticism, does not make an expert unreliable.

---

[5] Brownell also contends that two of the jobs listed have changed so that they are now beyond his skill level, because the Dictionary of Occupational Titles was last revised in 1991.  Brownell's motion to correct the record was denied, and there is no record evidence concerning that contention.

Brownell's strongest arguments are that the ALJ should not have relied on Baruch's numbers because they were national numbers that did not account for local variations and the effect of the recession. The relevant statute provides that "'work which exists in the national economy' means work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1566 ("We consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether (1) work exists in the immediate area in which you live; (2) a specific job vacancy exists for you; or (3) you would be hired if you applied for work."). Baruch conceded that she had provided national numbers, and that if she had provided the numbers for either the region where plaintiff lived or a number of other regions they would have been lower. (A.R. 57). She did not testify as to how much lower. In addition, she testified that because of the recession, the number of available jobs could be as much as 30% lower, though that was a non-industry-specific estimate. (A.R. 58). In response to those arguments, the ALJ credited Baruch's testimony that all the available methods for calculating jobs result in an estimate and noted that there was no requirement that experts provide an exact figure. (A.R. 36). He concluded: "I accept Ms. Baruch's testimony, based upon her experience and knowledge of labor markets and the data that is available, and find that she has provided valid estimates of the representative jobs." (*Id.*). He acknowledged that "[i]solated jobs that existed only in very limited numbers in relatively few locations outside the region where [the claimant] live[s] are not considered 'work which exists in the national economy,'" but determined that, here, evidence that three representative jobs with numbers "exceeding 12,000 combined" and two with greater than 5,000 jobs available was "not consistent with isolated jobs in very limited numbers or few

locations." (A.R. 37).

Although it is a close question, the Court finds that the ALJ was within his authority to credit and rely on Baruch's testimony as substantial evidence for the proposition that there were sufficient jobs either in the region where plaintiff lived or in several other regions of the country. It is the ALJ's prerogative to resolve conflicts in the evidence and determine issues of credibility, as he did here. *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991); *see Purdy v. Berryhill*, 887 F.3d 7, 16 (1st Cir. 2018) ("Admissibility of evidence before an ALJ presiding over Social Security proceedings is not subject to the Federal Rules of Evidence, and an ALJ is given express authority to assess the reliability of the evidence offered."). Even where reasonable minds may differ, the Court must accept the ALJ's conclusions as long as there is substantial evidence in the record to support it. Baruch's testimony meets that standard here. The ALJ therefore properly based his decision on the amended numbers provided by the vocational expert in deciding that there were significant job numbers in the national economy, even though there was no exact figure and the evidence could have supported a lower number of jobs.

Accepting the testimony of the vocational expert, there were a significant number of jobs plaintiff could have performed as of the date he was last insured. Plaintiff correctly points out that the term "significant" is not specifically defined in the Social Security Act, and that the case law is somewhat scattered. But the result here is within the range of those precedents.

There is no obvious problem with the ALJ's adding the numbers of jobs together. The regulation states: "Work exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet . . . ." 20 C.F.R. § 404.1566(b) (emphasis added). By its plain text, the regulation contemplates

aggregating occupations. And, because the purpose of the exercise is to find whether a claimant could find work of any kind, there is no reason to require that there be a sufficient number of jobs in any one type of job. Therefore, the ALJ properly aggregated the numbers provided by the vocational expert to arrive at approximately 12,000 combined. (A.R. 37).[6] *See, e.g.*, *Montalbo v. Colvin*, 231 F. Supp. 3d 846, 863 (D. Haw. 2017) (holding that the 12,300 jobs found by the vocational expert, including electric parts assembler (5,500 jobs); small parts assembler (1,300 jobs); and solderer, assembler (5,000 jobs) were sufficient in light of the discretion afforded to the ALJ in determining whether the number of jobs available is significant).

Furthermore, even if the ALJ had not aggregated the numbers, some courts have held that even a relatively small number of jobs can be "significant." *See Tetrault v. Astrue*, 2011 WL 613701, at *6 (D. Mass. Feb. 11, 2011) (holding that "there is not a magic, sufficient number," and that courts have found sufficient numbers of jobs to exist in the local or regional economy at levels as low as 200); *id.* (citing *Craigie v. Bowen,* 835 F.2d 56, 58 (3d Cir.1987) (finding 200 jobs in region sufficient); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir.1987) (finding 174 jobs in local area, 1,600 jobs statewide, and 80,000 jobs nationwide sufficient)); *see also Critchley v. Colvin*, 2016 WL 3030211, at *8 (S.D.W. Va. May 4, 2016), *rep. & rec. adopted*, 2016 WL 3033763 (S.D.W. Va. May 26, 2016) (citing cases finding jobs on the order of 5,000 jobs nationally significant). And "[c]ourts have generally held that what constitutes a 'significant' number is fairly minimal." *Fox v. Comm'r of Soc. Sec.*, 2009 WL 367628, at *20 (N.D.N.Y. Feb. 13, 2009) (citing cases where 200 to 1500 jobs found sufficient). While there are cases to the contrary, the question of what is "significant" in any given context is a question of fact. *See*

---

[6] *See supra* note 3.

*Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 527-28 (9th Cir. 2014). Therefore, the ALJ was within his discretion to find that the number of jobs here was sufficient.

Furthermore, the ALJ properly relied on the Grid to find that Brownell was not disabled, because his non-exertional limitations do not significantly impair his ability to perform at a given exertional level. "Where a claimant's impairments involve only limitations in meeting the strength requirements of work, the Grid provides a 'streamlined' method" by which the Commissioner can meet her burden to show that there are jobs in the national economy that a claimant can perform. *Heggarty v. Sullivan*, 947 F.2d 990, 996 (1st Cir. 1991).

> If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability. Yet the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence.

*Id.* (quoting *Ortiz v. Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989)); *see also Rose v. Shalala*, 34 F.3d 13, 19 (1st Cir. 1994). The ALJ properly found that the assessed RFC, which included the limitation that Brownell "must avoid concentrated exposure to temperature extremes and pulmonary irritants," was closer to the first category of environmental restrictions stated in SSR 85-15, which requires avoiding "excessive" exposure to pulmonary irritants, than the second category, which applies when the claimant "can tolerate very little noise, dust, etc." (A.R. 29, 33, 37); SSR 85-15, 1985 WL 56857, at *8 (Jan. 1, 1985). The ALJ could therefore properly rely on SSR 85-15 to find that "the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.," and therefore apply medical vocational Grid Rule 202.11. (A.R. 37). That alone supports his finding that Brownell was not disabled, apart from any inadequacies in the vocational testimony. (A.R. 29, 37); 20 C.F.R. Pt. 404, Subpt. P, App. 2.

**IV.** **Conclusion**

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner

is DENIED, and defendant's motion to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

                                        /s/  F. Dennis Saylor

                                        F. Dennis Saylor, IV

Dated:  June 27, 2018                       United States District Judge